Justice SCALIA, dissenting.
I join Justice SOTOMAYOR's dissent except as to one detail. I reject the conclusion that the Court draws from the words "continued custody" in 25 U.S. C § 1912(f) not because *668 "literalness may strangle meaning," see post, at 2577, but because there is no reason that "continued" must refer to custody in the past rather than custody in the future. I read the provision as requiring the court to satisfy itself (beyond a reasonable doubt) *2572 not merely that initial or temporary custody is not "likely to result in serious emotional or physical damage to the child," but that continued custody is not likely to do so. See Webster's New International Dictionary 577 (2d ed. 1950) (defining "continued" as " [p]rotracted in time or space, esp. without interruption; constant"). For the reasons set forth in Justice SOTOMAYOR's dissent, that connotation is much more in accord with the rest of the statute.
While I am at it, I will add one thought. The Court's opinion, it seems to me, needlessly demeans the rights of parenthood. It has been the constant practice of the common law to respect the entitlement of those who bring a child into the world to raise that child. We do not inquire whether leaving a child with his parents is "in the best interest of the child." It sometimes is not; he would be better off raised by someone else. But parents have their rights, no less than children do. This father wants to raise his daughter, and the statute amply protects his right to do so. There is no reason in law or policy to dilute that protection.
Justice SOTOMAYOR, with whom Justice GINSBURG and Justice KAGAN join, and with whom Justice SCALIA joins in part, dissenting.
A casual reader of the Court's opinion could be forgiven for thinking this an easy case, one in which the text of the applicable statute clearly points the way to the only sensible result. In truth, however, the path from the text of the Indian Child Welfare Act of 1978 (ICWA) to the result the Court reaches is anything but clear, and its result anything but right.
The reader's first clue that the majority's supposedly straightforward reasoning is flawed is that not all Members *669 who adopt its interpretation believe it is compelled by the text of the statute, see ante, at 2565 (THOMAS, J., concurring); nor are they all willing to accept the consequences it will necessarily have beyond the specific factual scenario confronted here, see ante, at 2571 (BREYER, J., concurring). The second clue is that the majority begins its analysis by plucking out of context a single phrase from the last clause of the last subsection of the relevant provision, and then builds its entire argument upon it. That is not how we ordinarily read statutes. The third clue is that the majority openly professes its aversion to Congress' explicitly stated purpose in enacting the statute. The majority expresses concern that reading the Act to mean what it says will make it more difficult to place Indian children in adoptive homes, see ante, at 2563 - 2564, 2564 - 2565, but the Congress that enacted the statute announced its intent to stop "an alarmingly high percentage of Indian families [from being] broken up" by, among other things, a trend of "plac [ing] [Indian children] in non-Indian ... adoptive homes." 25 U.S.C. § 1901(4). Policy disagreement with Congress' judgment is not a valid reason for this Court to distort the provisions of the Act. Unlike the majority, I cannot adopt a reading of ICWA that is contrary to both its text and its stated purpose. I respectfully dissent.
I
Beginning its reading with the last clause of § 1912(f), the majority concludes that a single phrase appearing there-"continued custody"-means that the entirety of the subsection is inapplicable to any parent, however committed, who has not previously had physical or legal custody of his child. Working back to front, the majority then concludes that § 1912(d), tainted by its association with § 1912(f), is also inapplicable; in the majority's view, a family bond that does not take custodial form is not a family bond worth preserving *2573 from "breakup." Because there are apparently no limits on the contaminating power of this single phrase, the majority *670 does not stop there. Under its reading, § 1903(9), which makes biological fathers "parent[s]" under this federal statute (and where, again, the phrase "continued custody" does not appear), has substantive force only when a birth father has physical or state-recognized legal custody of his daughter.
When it excludes noncustodial biological fathers from the Act's substantive protections, this textually backward reading misapprehends ICWA's structure and scope. Moreover, notwithstanding the majority's focus on the perceived parental shortcomings of Birth Father, its reasoning necessarily extends to all Indian parents who have never had custody of their children, no matter how fully those parents have embraced the financial and emotional responsibilities of parenting. The majority thereby transforms a statute that was intended to provide uniform federal standards for child custody proceedings involving Indian children and their biological parents into an illogical piecemeal scheme.
A
Better to start at the beginning and consider the operation of the statute as a whole. Cf. ante, at 2563 ("[S]tatutory construction 'is a holistic endeavor[,]' and ... '[a] provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme' " (quoting United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) )).
ICWA commences with express findings. Congress recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," 25 U.S.C. § 1901(3), and it found that this resource was threatened. State authorities insufficiently sensitive to "the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families" were breaking up Indian families and moving Indian children to non-Indian homes and institutions. See §§ 1901(4) - (5). As § 1901(4) makes clear, and as this Court *671 recognized in Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 33, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989), adoptive placements of Indian children with non-Indian families contributed significantly to the overall problem. See § 1901(4) (finding that "an alarmingly high percentage of [Indian] children are placed in non-Indian ... adoptive homes").
Consistent with these findings, Congress declared its purpose "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards" applicable to child custody proceedings involving Indian children. § 1902. Section 1903 then goes on to establish the reach of these protections through its definitional provisions. For present purposes, two of these definitions are crucial to understanding the statute's full scope.
First, ICWA defines the term "parent" broadly to mean "any biological parent ... of an Indian child or any Indian person who has lawfully adopted an Indian child." § 1903(9). It is undisputed that Baby Girl is an "Indian child" within the meaning of the statute, see § 1903(4) ; ante, at 2557, n. 1, and Birth Father consequently qualifies as a "parent" under the Act. The statutory definition of parent "does not include the unwed father where paternity has not been acknowledged or established," § 1903(9), but Birth Father's biological paternity has never been questioned by any party and was confirmed by a DNA test during the *2574 state court proceedings, App. to Pet. for Cert. 109a (Sealed).
Petitioners and Baby Girl's guardian ad litem devote many pages of briefing to arguing that the term "parent" should be defined with reference to the law of the State in which an ICWA child custody proceeding takes place. See Brief for Petitioners 19-29; Brief for Respondent Guardian Ad Litem 32-41. These arguments, however, are inconsistent with our recognition in Holyfield that Congress intended the critical terms of the statute to have uniform federal definitions. See 490 U.S., at 44-45, 109 S.Ct. 1597. It is therefore unsurprising, *672 although far from unimportant, that the majority assumes for the purposes of its analysis that Birth Father is an ICWA "parent." See ante, at 2559 - 2560.
Second, the Act's comprehensive definition of "child custody proceeding" includes not only " 'adoptive placement[s],' " " 'preadoptive placement[s],' " and " 'foster care placement[s],' " but also " 'termination of parental rights' " proceedings. § 1903(1). This last category encompasses "any action resulting in the termination of the parent-child relationship, " § 1903(1)(ii) (emphasis added). So far, then, it is clear that Birth Father has a federally recognized status as Baby Girl's "parent" and that his "parent-child relationship" with her is subject to the protections of the Act.
These protections are numerous. Had Birth Father petitioned to remove this proceeding to tribal court, for example, the state court would have been obligated to transfer it absent an objection from Birth Mother or good cause to the contrary. See § 1911(b). Any voluntary consent Birth Father gave to Baby Girl's adoption would have been invalid unless written and executed before a judge and would have been revocable up to the time a final decree of adoption was entered.[1] See §§ 1913(a), (c). And § 1912, the center of the dispute here, sets forth procedural and substantive standards applicable in "involuntary proceeding[s] in a State court," including foster care placements of Indian children and termination of parental rights proceedings. § 1912(a). I consider § 1912's provisions in order.
Section 1912(a) requires that any party seeking "termination of parental rights t[o] an Indian child" provide notice to *673 both the child's "parent or Indian custodian" and the child's tribe "of the pending proceedings and of their right of intervention." Section 1912(b) mandates that counsel be provided for an indigent "parent or Indian custodian" in any "termination proceeding." Section 1912(c) also gives all "part[ies]" to a termination proceeding-which, thanks to §§ 1912(a) and (b), will always include a biological father if he desires to be present-the right to inspect all material "reports or other documents filed with the court." By providing notice, counsel, and access to relevant documents, the statute ensures a biological father's meaningful participation in an adoption proceeding where the termination of his parental rights is at issue.
These protections are consonant with the principle, recognized in our cases, that the biological bond between parent and child is meaningful. "[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children," we have explained, "is an interest far more precious than any property *2575 right." Santosky v. Kramer, 455 U.S. 745, 758-759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (internal quotation marks omitted). See also infra, at 2581 - 2583. Although the Constitution does not compel the protection of a biological father's parent-child relationship until he has taken steps to cultivate it, this Court has nevertheless recognized that "the biological connection ... offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring." Lehr v. Robertson, 463 U.S. 248, 262, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Federal recognition of a parent-child relationship between a birth father and his child is consistent with ICWA's purpose of providing greater protection for the familial bonds between Indian parents and their children than state law may afford.
The majority does not and cannot reasonably dispute that ICWA grants biological fathers, as "parent[s]," the right to be present at a termination of parental rights proceeding and *674 to have their views and claims heard there.[2] But the majority gives with one hand and takes away with the other. Having assumed a uniform federal definition of "parent" that confers certain procedural rights, the majority then illogically concludes that ICWA's substantive protections are available only to a subset of "parent[s]": those who have previously had physical or state-recognized legal custody of his or her child. The statute does not support this departure.
Section 1912(d) provides that
"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (Emphasis added.)
In other words, subsection (d) requires that an attempt be made to cure familial deficiencies before the drastic measures of foster care placement or termination of parental rights can be taken.
The majority would hold that the use of the phrase "breakup of the Indian family" in this subsection means that it does not apply where a birth father has not previously had custody of his child. Ante, at 2562 - 2563. But there is nothing about this capacious phrase that licenses such a narrowing construction. As the majority notes, "breakup" means " '[t]he discontinuance of a relationship.' " Ante, at 2562 (quoting American Heritage Dictionary 235 (3d ed. 1992)). So far, all of § 1912's provisions expressly apply in actions aimed at terminating the "parent-child relationship" that exists between a birth father and his child, and they extend to it meaningful protections. As a logical matter, that relationship *675 is fully capable of being preserved via remedial services and rehabilitation programs. See infra, at 2564 - 2565. Nothing in the text of subsection (d) indicates that this blood relationship should be excluded from the category of familial " relationships" that the provision aims to save from "discontinuance."
The majority, reaching the contrary conclusion, asserts baldly that "when an Indian parent abandons an Indian child prior to birth and that child has never been in the Indian parent's legal or physical custody, there is no 'relationship' that would be 'discontinu[ed]' ... by the termination of the Indian parent's rights." Ante, at 2565.
*2576 Says who? Certainly not the statute. Section 1903 recognizes Birth Father as Baby Girl's "parent," and, in conjunction with ICWA's other provisions, it further establishes that their "parent-child relationship" is protected under federal law. In the face of these broad definitions, the majority has no warrant to substitute its own policy views for Congress' by saying that "no 'relationship' " exists between Birth Father and Baby Girl simply because, based on the hotly contested facts of this case, it views their family bond as insufficiently substantial to deserve protection.[3] Ibid.
The majority states that its "interpretation of § 1912(d) is ... confirmed by the provision's placement next to § 1912(e)
*676 and § 1912(f)," both of which use the phrase " 'continued custody.' " Ante, at 2563. This is the only aspect of the majority's argument regarding § 1912(d) that is based on ICWA's actual text rather than layers of assertion superimposed on the text; but the conclusion the majority draws from the juxtaposition of these provisions is exactly backward.
Section 1912(f) is paired with § 1912(e), and as the majority notes, both come on the heels of the requirement of rehabilitative efforts just reviewed. The language of the two provisions is nearly identical; subsection (e) is headed "Foster care placement orders," and subsection (f), the relevant provision here, is headed "Parental rights termination orders." Subsection (f) reads in its entirety,
"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 1912(f).[4]
The immediate inference to be drawn from the statute's structure is that subsections (e) and (f) work in tandem with the rehabilitative efforts required by (d). Under subsection (d), state authorities must attempt to provide "remedial services and rehabilitative programs" aimed at avoiding foster care placement or termination of parental rights; (e) and (f), in turn, bar state authorities from ordering foster care or terminating parental rights until these curative efforts have failed and it is established that the child will suffer "serious *677 emotional or physical damage" if his or her familial situation is not altered. Nothing in subsections (a) through (d) suggests a limitation on the types of parental relationships *2577 that are protected by any of the provisions of § 1912, and there is nothing in the structure of § 1912 that would lead a reader to expect subsection (e) or (f) to introduce any such qualification. Indeed, both subsections, in their opening lines, refer back to the prior provisions of § 1912 with the phrase "in such proceeding." This language indicates, quite logically, that in actions where subsections (a), (b), (c), and (d) apply, (e) and (f) apply too.[5]
All this, and still the most telling textual evidence is yet to come: The text of the subsection begins by announcing, "[n]o termination of parental rights may be ordered" unless the specified evidentiary showing is made. To repeat, a "termination of parental rights" includes "any action resulting in the termination of the parent-child relationship," 25 U.S.C. § 1903(1)(ii) (emphasis added), including the relationship Birth Father, as an ICWA "parent," has with Baby Girl. The majority's reading disregards the Act's sweeping definition of "termination of parental rights," which is not limited to terminations of custodial relationships.
The entire foundation of the majority's argument that subsection (f) does not apply is the lonely phrase "continued custody." It simply cannot bear the interpretive weight the majority would place on it.
*678 Because a primary dictionary definition of "continued" is " 'carried on or kept up without cessation,' " ante, at 2560 (brackets omitted), the majority concludes that § 1912(f)"does not apply in cases where the Indian parent never had custody of the Indian child," ante, at 2560. Emphasizing that Birth Father never had physical custody or, under state law, legal custody of Baby Girl, the majority finds the statute inapplicable here. Ante, at 2576 - 2578. But "literalness may strangle meaning." Utah Junk Co. v. Porter, 328 U.S. 39, 44, 66 S.Ct. 889, 90 L.Ed. 1071 (1946). See also Robinson v. Shell Oil Co., 519 U.S. 337, 341-345, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (noting that a term that may " [a]t first blush" seem unambiguous can prove otherwise when examined in the context of the statute as a whole).[6] In light of the structure of § 1912, which indicates that subsection (f) is applicable to the same actions to which subsections (a) through (d) are applicable; the use of the phrase " such proceeding[s]" at the start of subsection (f) to reinforce this structural inference; and finally, the provision's explicit statement that it applies to "termination of parental rights" proceedings, the necessary conclusion is that the word "custody" does not strictly denote a state-recognized custodial relationship. If one refers back to the Act's definitional section, this conclusion is not surprising. Section 1903(1) includes "any action resulting in the termination of the parent-child relationship" within the meaning of "child custody proceeding," thereby belying any congressional *2578 intent to give the term "custody" a narrow and exclusive definition throughout the statute.
In keeping with § 1903(1) and the structure and language of § 1912 overall, the phrase "continued custody" is most sensibly read to refer generally to the continuation of the parent-child relationship that an ICWA "parent" has with *679 his or her child. A court applying § 1912(f) where the parent does not have pre-existing custody should, as Birth Father argues, determine whether the party seeking termination of parental rights has established that the continuation of the parent-child relationship will result in "serious emotional or physical damage to the child."[7]
The majority is willing to assume, for the sake of argument, that Birth Father is a "parent" within the meaning of ICWA. But the majority fails to account for all that follows from that assumption. The majority repeatedly passes over the term "termination of parental rights" that, as defined by § 1903, clearly encompasses an action aimed at severing Birth Father's "parent-child relationship" with Baby Girl. The majority chooses instead to focus on phrases not statutorily defined that it then uses to exclude Birth Father from the benefits of his parental status. When one must disregard a statute's use of terms that have been explicitly defined by Congress, that should be a signal that one is distorting, rather than faithfully reading, the law in question.
B
The majority also does not acknowledge the full implications of its assumption that there are some ICWA "parent[s]" to whom §§ 1912(d) and (f) do not apply. Its discussion focuses on Birth Father's particular actions, but nothing in the majority's reasoning limits its manufactured class of semiprotected ICWA parents to biological fathers who failed to *680 support their child's mother during pregnancy. Its logic would apply equally to noncustodial fathers who have actively participated in their child's upbringing.
Consider an Indian father who, though he has never had custody of his biological child, visits her and pays all of his child support obligations.[8] Suppose that, due to *2579 deficiencies *681 in the care the child received from her custodial parent, the State placed the child with a foster family and proposed her ultimate adoption by them. Clearly, the father's parental rights would have to be terminated before the adoption could go forward.[9] On the majority's view, notwithstanding the fact that this father would be a "parent" under ICWA, he would not receive the benefit of either § 1912(d) or § 1912(f). Presumably the court considering the adoption petition would have to apply some standard to determine whether termination of his parental rights was appropriate. But from whence would that standard come?
Not from the statute Congress drafted, according to the majority. The majority suggests that it might come from state law. See ante, at 2563, n. 8. But it is incongruous to suppose that Congress intended a patchwork of federal and state law to apply in termination of parental rights proceedings. Congress enacted a statute aimed at protecting the familial relationships between Indian parents and their children because it concluded that state authorities "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." 25 U.S.C. § 1901(5). It provided a "minimum Federal standar [d]," § 1902, for termination of parental rights that is more demanding than the showing of unfitness under a high "clear and convincing evidence" standard that is the norm in the States, see 1 J.
*682 Hollinger, Adoption Law and Practice § 2.10 (2012); Santosky, 455 U.S., at 767-768, 102 S.Ct. 1388.
While some States might provide protections comparable to § 1912(d)'s required remedial efforts and § 1912(f)'s heightened standard for termination of parental rights, many will provide less. There is no reason to believe Congress wished to leave protection of the parental rights of a subset of ICWA "parent[s]" dependent on the happenstance of where a particular "child custody proceeding" takes place. I would apply, as the statute construed in its totality commands, the standards Congress provided in §§ 1912(d) and (f) to the termination *2580 of all ICWA "parent[s']" parent-child relationships.
II
The majority's textually strained and illogical reading of the statute might be explicable, if not justified, if there were reason to believe that it avoided anomalous results or furthered a clear congressional policy. But neither of these conditions is present here.
A
With respect to § 1912(d), the majority states that it would be "unusual" to apply a rehabilitation requirement where a natural parent has never had custody of his child. Ante, at 2563 - 2564. The majority does not support this bare assertion, and in fact state child welfare authorities can and do provide reunification services for biological fathers who have not previously had custody of their children.[10] And *683 notwithstanding the South Carolina Supreme Court's imprecise interpretation of the provision, see 398 S.C., at 647-648, 731 S.E.2d, at 562, § 1912(d) does not require the prospective adoptive family to themselves undertake the mandated rehabilitative efforts. Rather, it requires the party seeking termination of parental rights to "satisfy the court that active efforts have been made" to provide appropriate remedial services.
In other words, the prospective adoptive couple have to make an evidentiary showing, not undertake person-to-person remedial outreach. The services themselves might be attempted by the Indian child's Tribe, a state agency, or a private adoption agency. Such remedial efforts are a familiar requirement of child welfare law, including federal child welfare policy. See 42 U.S.C. § 671(a)(15)(B) (requiring States receiving federal funds for foster care and adoption assistance to make "reasonable efforts ... to preserve and reunify families" prior to foster care placement or removal of a child from its home).
There is nothing "bizarre," ante, at 2563 - 2564, about placing on the party seeking to terminate a father's parental rights the burden of showing that the step is necessary as well as justified. "For ... natural parents, ... the consequence of an erroneous termination [of parental rights] is the unnecessary destruction of their natural family." Santosky, 455 U.S., at 766, 102 S.Ct. 1388. In any event, the question is a nonissue in this case given the family court's finding that Birth Father is "a fit and proper person to have custody of his child" who "has demonstrated [his] ability to parent effectively" and who possesses "unwavering love for this child." App. to *684 Pet. for Cert. 128a (Sealed). Petitioners cannot show that rehabilitative efforts have "proved unsuccessful," 25 U.S.C. § 1912(d), because Birth Father is not in need of rehabilitation.[11] *2581 B
On a more general level, the majority intimates that ICWA grants Birth Father an undeserved windfall: in the majority's words, an "ICWA trump card" he can "play ... at the eleventh hour to override the mother's decision and the child's best interests." Ante, at 2565. The implicit argument is that Congress could not possibly have intended to recognize a parent-child relationship between Birth Father and Baby Girl that would have to be legally terminated (either by valid consent or involuntary termination) before the adoption could proceed.
But this supposed anomaly is illusory. In fact, the law of at least 15 States did precisely that at the time ICWA was passed.[12] And the law of a number of States still does so.
*685 The State of Arizona, for example, requires that notice of an adoption petition be given to all "potential father [s]" and that they be informed of their "right to seek custody." Ariz.Rev.Stat. §§ 8-106(G)-(J) (West Supp.2012). In Washington, an "alleged father['s]" consent to adoption is required absent the termination of his parental rights, Wash. Rev.Code §§ 26.33.020(1), 26.33.160(1)(b) (2012); and those rights may be terminated only "upon a showing by clear, cogent, and convincing evidence" not only that termination is in the best interest of the child and that the father is withholding his consent to adoption contrary to child's best interests, but also that the father "has failed to perform parental duties under circumstances showing a substantial lack of regard for his parental obligations," § 26.33.120(2).[13]
*2582 Without doubt, laws protecting biological fathers' parental rights can lead-even outside the context of ICWA-to outcomes that are painful and distressing for both would-be adoptive families, who lose a much wanted child, and children who must make a difficult transition. See, e.g., In re Adoption of Tobias D., 2012 Me. 45, ¶ 27, 40 A.3d 990, 999 (recognizing that award of custody of 2 ½-year-old child to biological *686 father under applicable state law once paternity is established will result in the " difficult and painful" necessity of "removing the child from the only home he has ever known"). On the other hand, these rules recognize that biological fathers have a valid interest in a relationship with their child. See supra, at 2574 - 2575. And children have a reciprocal interest in knowing their biological parents. See Santosky, 455 U.S., at 760-761, n. 11, 102 S.Ct. 1388 (describing the foreclosure of a newborn child's opportunity to " ever know his natural parents" as a "los[s] [that] cannot be measured"). These rules also reflect the understanding that the biological bond between a parent and a child is a strong foundation on which a stable and caring relationship may be built. Many jurisdictions apply a custodial preference for a fit natural parent over a party lacking this biological link. See, e.g., Ex parte Terry, 494 So.2d 628, 632 (Ala.1986) ; Appeal of H. R., 581 A.2d 1141, 1177 (D.C.1990) (opinion of Ferren, J.); Stuhr v. Stuhr, 240 Neb. 239, 245, 481 N.W.2d 212, 216 (1992) ; In re Michael B., 80 N.Y.2d 299, 309, 590 N.Y.S.2d 60, 604 N.E.2d 122, 127 (1992). Cf. Smith v. Organization of Foster Families For Equality & Reform, 431 U.S. 816, 845, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (distinguishing a natural parent's "liberty interest in family privacy," which has its source "in intrinsic human rights," with a foster parent's parallel interest in his or her relationship with a child, which has its "origins in an arrangement in which the State has been a partner from the outset"). This preference is founded in the "presumption that fit parents act in the best interests of their children." Troxel v. Granville, 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). " '[H]istorically [the law] has recognized that natural bonds of affection [will] lead parents' " to promote their child's well-being. Ibid. (quoting Parham v. J. R., 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ).
Balancing the legitimate interests of unwed biological fathers against the need for stability in a child's family situation is difficult, to be sure, and States have, over the years, taken different approaches to the problem. Some States, *687 like South Carolina, have opted to hew to the constitutional baseline established by this Court's precedents and do not require a biological father's consent to adoption unless he has provided financial support during pregnancy. See Quilloin v. Walcott, 434 U.S. 246, 254-256, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ; Lehr, 463 U.S., at 261, 103 S.Ct. 2985. Other States, however, have decided to give the rights of biological fathers more robust protection and to afford them consent rights on the basis of their biological link to the child. At the time that ICWA was passed, as noted, over one-fourth of States did so. See supra, at 2580 - 2581.
ICWA, on a straightforward reading of the statute, is consistent with the law of those States that protected, and protect, birth fathers' rights more vigorously. This reading can hardly be said to generate an anomaly. ICWA, as all acknowledge, was "the product of rising concern *2583 ... [about] abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families." Holyfield, 490 U.S., at 32, 109 S.Ct. 1597. It stands to reason that the Act would not render the legal status of an Indian father's relationship with his biological child fragile, but would instead grant it a degree of protection commensurate with the more robust state-law standards.[14]
C
The majority also protests that a contrary result to the one it reaches would interfere with the adoption of Indian *688 children. Ante, at 2563 - 2564, 2564 - 2565. This claim is the most perplexing of all. A central purpose of ICWA is to "promote the stability and security of Indian ... families," 25 U.S.C. § 1902, in part by countering the trend of placing "an alarmingly high percentage of [Indian] children ... in non-Indian foster and adoptive homes and institutions." § 1901(4). The Act accomplishes this goal by, first, protecting the familial bonds of Indian parents and children, see supra, at 2573 - 2578; and, second, establishing placement preferences should an adoption take place, see § 1915(a). ICWA does not interfere with the adoption of Indian children except to the extent that it attempts to avert the necessity of adoptive placement and makes adoptions of Indian children by non-Indian families less likely.
The majority may consider this scheme unwise. But no principle of construction licenses a court to interpret a statute with a view to averting the very consequences Congress expressly stated it was trying to bring about. Instead, it is the " 'judicial duty to give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question.' " Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 298, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) (quoting United States v. Bornstein, 423 U.S. 303, 310, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) ).
The majority further claims that its reading is consistent with the "primary" purpose of the Act, which in the majority's view was to prevent the dissolution of "intact" Indian families. Ante, at 2560 - 2562. We may not, however, give effect only to congressional goals we designate "primary" while casting aside others classed as "secondary"; we must apply the entire statute Congress has written. While there are indications that central among Congress' concerns in enacting ICWA was the removal of Indian children from homes in which Indian parents or other guardians had custody of them, see, e.g., §§ 1901(4), 1902, Congress also recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children,"
*689 § 1901(3). As we observed in Holyfield, ICWA protects not only Indian parents' interests but also those of Indian tribes. See 490 U.S., at 34, 52, 109 S.Ct. 1597. A tribe's interest in its next generation of citizens is adversely *2584 affected by the placement of Indian children in homes with no connection to the tribe, whether or not those children were initially in the custody of an Indian parent.[15]
Moreover, the majority's focus on "intact" families, ante, at 2561 - 2562, begs the question of what Congress set out to accomplish with ICWA. In an ideal world, perhaps all parents would be perfect. They would live up to their parental responsibilities by providing the fullest possible financial and emotional support to their children. They would never suffer mental health problems, lose their jobs, struggle with substance dependency, or encounter any of the other multitudinous personal crises that can make it difficult to meet these responsibilities. In an ideal world parents would never become estranged and leave their children caught in the middle. But we do not live in such a world. Even happy families do not always fit the custodial-parent mold for which the majority would reserve ICWA's substantive protections; unhappy families all too often do not. They are families nonetheless. Congress understood as much. ICWA's definitions of "parent" and "termination of parental rights" provided in § 1903 sweep broadly. They should be honored.
D
The majority does not rely on the theory pressed by petitioners and the guardian ad litem that the canon of constitutional avoidance compels the conclusion that ICWA is inapplicable here. See Brief for Petitioners 43-51; Brief for Respondent Guardian Ad Litem 48-58. It states instead *690 that it finds the statute clear.[16] Ante, at 2565. But the majority nevertheless offers the suggestion that a contrary result would create an equal protection problem. Ibid. Cf. Brief for Petitioners 44-47; Brief for Respondent Guardian Ad Litem 53-55.
It is difficult to make sense of this suggestion in light of our precedents, which squarely hold that classifications based on Indian tribal membership are not impermissible racial classifications. See United States v. Antelope, 430 U.S. 641, 645-647, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) ; Morton v. Mancari, 417 U.S. 535, 553-554, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The majority's repeated, analytically unnecessary references to the fact that Baby Girl is 3/256 Cherokee by ancestry do nothing to elucidate its intimation that the statute may violate the Equal Protection Clause as applied here. See ante, at 2556 - 2557, 2559; see also ante, at 2565 (stating that ICWA "would put certain vulnerable children at a great disadvantage solely because an ancestor-even a remote one -was an Indian" (emphasis added)). I see no ground for this Court to second-guess the membership requirements of federally *2585 recognized Indian tribes, which are independent political entities. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 72, n. 32, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). I am particularly averse to doing so when the Federal Government requires Indian tribes, as a prerequisite for official recognition, to make "descen[t] from a historical Indian tribe" a condition of membership. 25 CFR § 83.7(e) (2012). *691 The majority's treatment of this issue, in the end, does no more than create a lingering mood of disapprobation of the criteria for membership adopted by the Cherokee Nation that, in turn, make Baby Girl an "Indian child" under the statute. Its hints at lurking constitutional problems are, by its own account, irrelevant to its statutory analysis, and accordingly need not detain us any longer.
III
Because I would affirm the South Carolina Supreme Court on the ground that § 1912 bars the termination of Birth Father's parental rights, I would not reach the question of the applicability of the adoptive placement preferences of § 1915. I note, however, that the majority does not and cannot foreclose the possibility that on remand, Baby Girl's paternal grandparents or other members of the Cherokee Nation may formally petition for adoption of Baby Girl. If these parties do so, and if on remand Birth Father's parental rights are terminated so that an adoption becomes possible, they will then be entitled to consideration under the order of preference established in § 1915. The majority cannot rule prospectively that § 1915 would not apply to an adoption petition that has not yet been filed. Indeed, the statute applies "[i]n any adoptive placement of an Indian child under State law," 25 U.S.C. § 1915(a) (emphasis added), and contains no temporal qualifications. It would indeed be an odd result for this Court, in the name of the child's best interests, cf. ante, at 2564, to purport to exclude from the proceedings possible custodians for Baby Girl, such as her paternal grandparents, who may have well-established relationships with her.
* * *
The majority opinion turns § 1912 upside down, reading it from bottom to top in order to reach a conclusion that is manifestly contrary to Congress' express purpose in enacting ICWA: preserving the familial bonds between Indian parents *692 and their children and, more broadly, Indian tribes' relationships with the future citizens who are "vital to [their] continued existence and integrity." § 1901(3).
The majority casts Birth Father as responsible for the painful circumstances in this case, suggesting that he intervened "at the eleventh hour to override the mother's decision and the child's best interests," ante, at 2565. I have no wish to minimize the trauma of removing a 27-month-old child from her adoptive family. It bears remembering, however, that Birth Father took action to assert his parental rights when Baby Girl was four months old, as soon as he learned of the impending adoption. As the South Carolina Supreme Court recognized, " '[h]ad the mandate of ... ICWA been followed [in 2010], ... much potential anguish might have been avoided[;] and in any case the law cannot be applied so as automatically to "reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." ' " 398 S.C., at 652, 731 S.E.2d, at 564 (quoting Holyfield, 490 U.S., at 53-54, 109 S.Ct. 1597).
The majority's hollow literalism distorts the statute and ignores Congress' purpose in order to rectify a perceived wrong that, while heartbreaking at the time, was a *2586 correct application of federal law and that in any case cannot be undone. Baby Girl has now resided with her father for 18 months. However difficult it must have been for her to leave Adoptive Couple's home when she was just over 2 years old, it will be equally devastating now if, at the age of 3 ½, she is again removed from her home and sent to live halfway across the country. Such a fate is not foreordained, of course. But it can be said with certainty that the anguish this case has caused will only be compounded by today's decision.
I believe that the South Carolina Supreme Court's judgment was correct, and I would affirm it. I respectfully dissent.

South Carolina, for example, required traders to be licensed, to be of good moral character, and to post a bond. Ordinance to Regulate Indian Affairs, in 16 Early American Indian Documents, at 331-334. A potential applicant's name was posted publicly before issuing the license, so anyone with objections had an opportunity to raise them. Id., at 332. Restrictions were placed on employing agents, id., at 333-334, and names of potential agents had to be disclosed. Id., at 333. Traders who violated these rules were subject to substantial penalties. Id., at 331, 334.

Although Indians were generally considered "members" of a State if they paid taxes or were citizens, see Natelson 230, the precise definition of the term was "not yet settled" at the time of the founding and was "a question of frequent perplexity and contention in the federal councils," The Federalist No. 42, p. 265 (C. Rossiter ed. 1961) (J. Madison).

Petitioners and the guardian ad litem contend that applying the ICWA to child custody proceedings on the basis of race implicates equal protection concerns. See Brief for Petitioners 45 (arguing that the statute would be unconstitutional "if unwed fathers with no preexisting substantive parental rights receive a statutory preference based solely on the Indian child's race"); Brief for Respondent Guardian Ad Litem 48-49 (same). I need not address this argument because I am satisfied that Congress lacks authority to regulate the child custody proceedings in this case.

The full text of subsection (e) is as follows:
"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 1912(e).

For these reasons, I reject the argument advanced by the United States that subsection (d) applies in the circumstances of this case but subsection (f) does not. See Brief for United States as Amicus Curiae 24-26. The United States' position is contrary to the interrelated nature of §§ 1912(d), (e), and (f). Under the reading that the United States proposes, in a case such as this one the curative provision would stand alone; ICWA would provide no evidentiary or substantive standards by which to measure whether foster care placement or termination of parental rights could be ordered in the event that rehabilitative efforts did not succeed. Such a scheme would be oddly incomplete.

The majority's interpretation is unpersuasive even if one focuses exclusively on the phrase "continued custody" because, as Justice SCALIA explains, ante, at 2571 - 2572 (dissenting opinion), nothing about the adjective "continued" mandates the retrospective, rather than prospective, application of § 1912(f)'s standard.

The majority overlooks Birth Father's principal arguments when it dismisses his reading of § 1912(f) as "nonsensical." Ante, at 2560. He does argue that if one accepts petitioners' view that it is impossible to make a determination of likely harm when a parent lacks custody, then the consequence would be that " '[n]o termination of parental rights may be ordered.' " Brief for Respondent Birth Father 39 (quoting § 1912(f) ). But Birth Father's primary arguments assume that it is indeed possible to make a determination of likely harm in the circumstances of this case, and that parental rights can be terminated if § 1912(f) is met. See id ., at 40-42.

The majority attempts to minimize the consequences of its holding by asserting that the parent-child relationships of noncustodial fathers with visitation rights will be at stake in an ICWA proceeding in only "a relatively small class of cases." Ante, at 2563, n. 8. But it offers no support for this assertion, beyond speculating that there will not be many fathers affected by its interpretation of § 1912(d) because it is qualified by an "abandon[ment]" limitation. Ibid. Tellingly, the majority has nothing to say about § 1912(f), despite the fact that its interpretation of that provision is not limited in a similar way. In any event, this example by no means exhausts the class of semiprotected ICWA parents that the majority's opinion creates. It also includes, for example, biological fathers who have not yet established a relationship with their child because the child's mother never informed them of the pregnancy, see, e.g., In re Termination of Parental Rights of Biological Parents of Baby Boy W., 1999 OK 74, 988 P.2d 1270, told them falsely that the pregnancy ended in miscarriage or termination, see, e.g., A Child's Hope, LLC v. Doe, 178 N.C.App. 96, 630 S.E.2d 673 (2006), or otherwise obstructed the father's involvement in the child's life, see, e.g., In re Baby Girl W., 728 S.W.2d 545 (Mo.App.1987) (birth mother moved and did not inform father of her whereabouts); In re Petition of Doe, 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994) (father paid pregnancy expenses until birth mother cut off contact with him and told him that their child had died shortly after birth). And it includes biological fathers who did not contribute to pregnancy expenses because they were unable to do so, whether because the father lacked sufficient means, the expenses were covered by a third party, or the birth mother did not pass on the relevant bills. See, e.g., In re Adoption of B. V., 2001 UT App 290, ¶¶ 24-31, 33 P.3d 1083, 1087-1088.
The majority expresses the concern that my reading of the statute would produce "far-reaching consequences," because "even a sperm donor" would be entitled to ICWA's protections. Ante, at 2563, n. 8. If there are any examples of women who go to the trouble and expense of artificial insemination and then carry the child to term, only to put the child up for adoption or be found so unfit as mothers that state authorities attempt an involuntary adoptive placement-thereby necessitating termination of the parental rights of the sperm donor father-the majority does not cite them. As between a possibly overinclusive interpretation of the statute that covers this unlikely class of cases, and the majority's underinclusive interpretation that has the very real consequence of denying ICWA's protections to all noncustodial biological fathers, it is surely the majority's reading that is contrary to ICWA's design.

With a few exceptions not relevant here, before a final decree of adoption may be entered, one of two things must happen: "the biological parents must either voluntarily relinquish their parental rights or have their rights involuntarily terminated." 2 A. Haralambie, Handling Child Custody, Abuse and Adoption Cases § 14.1, pp. 764-765 (3d ed. 2009) (footnote omitted).

See, e.g., Cal. Welf. & Inst. Code Ann. § 361.5(a) (West Supp. 2013); Francisco G. v. Superior Court, 91 Cal.App.4th 586, 596, 110 Cal.Rptr.2d 679, 687 (2001) (stating that "the juvenile court 'may' order reunification services for a biological father if the court determines that the services will benefit the child"); In re T.B.W., 312 Ga.App. 733, 734-735, 719 S.E.2d 589, 591 (2011) (describing reunification services provided to biological father beginning when "he had yet to establish his paternity" under state law, including efforts to facilitate visitation and involving father in family " 'team meetings' "); In re Guardianship of DMH, 161 N.J. 365, 391-394, 736 A.2d 1261, 1275-1276 (1999) (discussing what constitutes "reasonable efforts" to reunify a noncustodial biological father with his children in accordance with New Jersey statutory requirements); In re Bernard T., 319 S.W.3d 586, 600 (Tenn.2010) (stating that "in appropriate circumstances, the Department [of Children's Services] must make reasonable efforts to reunite a child with his or her biological parents or legal parents or even with the child's putative biological father").

The majority's concerns about what might happen if no state or tribal authority stepped in to provide remedial services are therefore irrelevant here. Ante, at 2564, n. 9. But as a general matter, if a parent has rights that are an obstacle to an adoption, the state- and federal-law safeguards of those rights must be honored, irrespective of prospective adoptive parents' understandable and valid desire to see the adoption finalized. "We must remember that the purpose of an adoption is to provide a home for a child, not a child for a home." In re Petition of Doe, 159 Ill.2d, at 368, 202 Ill.Dec. 535, 638 N.E.2d, at 190 (Heiple, J., supplemental opinion supporting denial of rehearing).

See Ariz.Rev.Stat. Ann. § 8-106(A)(1)(c) (1974-1983 West Supp.) (consent of both natural parents necessary); Iowa Code §§ 600.3(2), 600A.2, 600A.8 (1977) (same) ; Ill. Comp. Stat., ch. 40, § 1510 (West 1977) (same) ; Nev.Rev.Stat. §§ 127.040, 127.090 (1971) (same); R.I. Gen. Laws §§ 15-7-5, 15-7-7 (Bobbs-Merrill 1970) (same); Conn. Gen.Stat. §§ 45-61d, 45-61i(b)(2) (1979) (natural father's consent required if paternity acknowledged or judicially established); Fla. Stat. § 63.062 (1979) (same) ; Ore.Rev.Stat. §§ 109.092, 109.312 (1975) (same); S.D. Codified Laws §§ 25-6-1.1, 25-6-4 (Allen Smith 1976) (natural father's consent required if mother identifies him or if paternity is judicially established); Ky.Rev.Stat. Ann. §§ 199.500, 199.607 (Bobbs-Merrill Supp. 1980) (same); Ala.Code § 26-10-3 (Michie 1977) (natural father's consent required when paternity judicially established); Minn.Stat. §§ 259.24(a), 259.26(3)(a), (e), (f), 259.261 (1978) (natural father's consent required when identified on birth certificate, paternity judicially established, or paternity asserted by affidavit); N.H.Rev.Stat. Ann. § 170-B:5(I)(d) (1977) (natural father's consent required if he files notice of intent to claim paternity within set time from notice of prospective adoption); Wash. Rev.Code §§ 26.32.040(5), 26.32.085 (1976) (natural father's consent required if paternity acknowledged, judicially established, or he files notice of intent to claim paternity within set time from notice of prospective adoption); W. Va.Code Ann. § 48-4-1 (Michie Supp. 1979) (natural father's consent required if father admits paternity by any means). See also Del.Code Ann., Tit. 13, § 908(2) (Michie Supp. 1980) (natural father's consent required unless court finds that dispensing with consent requirement is in best interests of the child); Wyo. Stat. Ann. §§ 1-22-108, 1-22-109 (Michie 1988) (same).

See also, e.g., Nev.Rev.Stat. §§ 127.040(1)(a), 128.150 (2011).

It bears emphasizing that the ICWA standard for termination of parental rights of which Birth Father claims the benefit is more protective than, but not out of step with, the clear and convincing standard generally applied in state courts when termination of parental rights is sought. Birth Father does not claim that he is entitled to custody of Baby Girl unless petitioners can satisfy the demanding standard of § 1912(f). See Brief for Respondent Birth Father 40, n. 15. The question of custody would be analyzed independently, as it was by the South Carolina Supreme Court. Of course, it will often be the case that custody is subsequently granted to a child's fit parent, consistent with the presumption that a natural parent will act in the best interests of his child. See supra, at 2581 - 2583.

Birth Father is a registered member of the Cherokee Nation, a fact of which Birth Mother was aware at the time of her pregnancy and of which she informed her attorney. See 398 S.C. 625, 632-633, 731 S.E.2d 550, 554 (2012).

Justice THOMAS concurs in the majority's interpretation because, although he finds the statute susceptible of more than one plausible reading, he believes that the majority's reading avoids "significant constitutional problems" concerning whether ICWA exceeds Congress' authority under the Indian Commerce Clause. Ante, at 2565, 2566 - 2571. No party advanced this argument, and it is inconsistent with this Court's precedents holding that Congress has "broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as plenary and exclusive," founded not only on the Indian Commerce Clause but also the Treaty Clause. United States v. Lara, 541 U.S. 193, 200-201, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (internal quotation marks omitted).